## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

**JEFFREY S. PETTY,**         )
                                      )
        **Petitioner,**        )     **NO. 3:18-cv-00576**
                                        )
**v.**                              )     **JUDGE CAMPBELL**
                                        )
**KEVIN HAMPTON, Warden,**    )
                                        )
        **Respondent.**

## MEMORANDUM

Jeffrey S. Petty, an inmate of the Bledsoe County Correctional Complex in Pikeville, Tennessee, filed a *pro se* petition for a writ of habeas corpus challenging his 2008 convictions and sentence for first-degree felony murder and arson, for which he is currently serving consecutive terms of life and five years imprisonment. (Doc. No. 1). Respondent, Warden Kevin Hampton, has filed an answer to the habeas petition.[1] (Doc. No. 13). The Petition is ripe for review, and this court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed and that Petitioner is not entitled to habeas relief. The Petition will be denied and this action will be dismissed.

## I. PROCEDURAL HISTORY

This case arises from a 2006 incident in which Petitioner and two friends robbed a trailer, killed the trailer's owner by shooting him in the head, and burned the trailer with the owner's body inside. On August 28, 2006, Petitioner was indicted in Dickson County, Tennessee on charges of

---

[1]      Petitioner has named former Warden Settles as the respondent to this action. Respondent has notified the Court that Kevin Hampton is the current Warden of Bledsoe County Correctional Complex. (Doc. No. 13 at 1 n.1). The proper respondent to a habeas petition filed under § 2254 is the state officer having custody over the petitioner. *See* Rule 2 of the Rules Gov'g Section 2254 Cases. Accordingly, the Court will order the Clerk to revise the docket in this matter to substitute Warden Kevin Hampton as the Respondent.

first-degree premeditated murder, first-degree felony murder, aggravated arson, especially aggravated burglary, and theft of property under $500. (Doc. No. 12-1 at 17-18). The State subsequently obtained a superseding indictment that added conspiracy to commit aggravated robbery, followed by a second superseding indictment that charged Petitioner with only felony murder and especially aggravated arson. (*Id*. at 51-53, 73).

On August 4, 2008, Petitioner proceeded to trial. (Doc. No. 12-5). Petitioner moved for judgment of acquittal after the close of the State's case-in-chief. The trial court granted the motion in part, because the State did not present proof of aggravated arson. (Doc. No. 12-8 at 68-91). On August 8, 2008, the jury found Petitioner guilty of first-degree felony murder and arson. (*Id*. at 126). The trial court sentenced him to life and five years imprisonment, respectively, to be served consecutively. (*Id*. at 128; Doc. No. 12-11). Petitioner appealed, and the Tennessee Court of Criminal Appeals ("TCCA") affirmed on February 12, 2013. *State v. Jeffrey Scott Petty*, No. M2009-01621-CCA-R3-CD, 2013 WL 510150 (Tenn. Crim. App. Feb. 12, 2013) (hereinafter "*Petty I*"). On July 10, 2013, the Tennessee Supreme Court denied discretionary review. (Doc. No. 12-20).

On September 27, 2013, Petitioner filed a timely *pro se* petition for post-conviction relief in the Dickson County Circuit Court. (Doc. No. 12-21 at 5-26). On October 16, 2013, the post-conviction trial court appointed counsel, who filed an amended petition and a second amended petition. (*Id*. at 30-63). On July 1, 2016, the trial court denied the petition after holding an evidentiary hearing. (*Id*. at 64-92). Petitioner timely appealed (*id*. at 93), and the TCCA affirmed the denial of post-conviction relief on July 19, 2017. *Petty v. State,* No. M2016-01488-CCA-R3-PC, 2017 WL 3078312, at *2 (Tenn. Crim. App. July 19, 2017), *perm. app. denied* (Tenn. Nov.

16, 2017) (hereinafter "*Petty II*"). On November 16, 2017, the Tennessee Supreme Court denied Petitioner's application for discretionary review. (Doc. No. 12-30).

On June 25, 2018, Petitioner timely filed the pending *pro se* Petition for a writ of habeas corpus. (Doc. No. 1 at 16.) By Order entered on July 6, 2018, this Court granted Petitioner permission to proceed as a pauper and directed Respondent to file an answer, plead or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 6). Respondent filed the state court record and an answer to the Petition on September 12, 2018, conceding that the Petition is timely and urging dismissal. (Doc. No. 12, 13).

Petitioner asserts four grounds for habeas relief. His first claim is that the trial court erred by giving a jury instruction on confession rather than admission against interest. (Doc. No. 1 at 10). His next three claims are that trial counsel provided constitutionally ineffective assistance by failing to: (1) object and move for a mistrial based on juror misconduct; (2) file a motion to suppress evidence found during the search of Petitioner's vehicle; and (3) raise all available grounds in the motion for new trial. (*Id*. at 11).

## II.  SUMMARY OF THE EVIDENCE

### A.  Trial Proceedings

According to the TCCA's summary of the proof at Petitioner's jury trial, the body of Kenneth Brake was discovered in a burning trailer in Vanleer, Tennessee, on June 30, 2006. *Petty I*, *2013 WL* 510150, at *1. An expert determined that Brake's cause of death was a gunshot wound to the back of the head and that he was deceased when the fire started. *Id*.

Petitioner subsequently gave three statements to law enforcement. *Id*. at *1. In his first statement on July 3, 2006, Petitioner admitted that he had lived in Brake's trailer and was forced to move out in January 2006. *Id*. He stated that he had no issues with Brake. *Id*. Petitioner initially

3

said that the last time he had been to the area of the trailer was when he moved out, but he later said that he had been to the area in the three weeks prior to giving the statement. *Id*. He admitted having been with James Cheaves on Wednesday, June 28, 2006. *Id*. Petitioner also said that on June 29, 2006, he got food from Krystal before falling asleep in his Jeep in a friend's driveway. *Id*. Upon awakening in the morning of June 30, 2006, Petitioner claimed that he returned to his father's house and stayed there. *Id*. He denied being in the area of Brake's trailer on June 30, 2006, and denied that he had recently pawned any property. *Id*. Petitioner gave a second statement on July 6, 2006, to resolve some discrepancies in his first statement. *Id*.

On July 12, 2006, Petitioner gave a third statement to law enforcement and signed a written statement. *Id*. He stated that on June 29, 2006, he talked to Thomas Dotson at Krystal, and they decided that they were going to rob Brake because Dotson needed money to purchase a vehicle. *Id*. Petitioner admitted picking up Dotson at Krystal at approximately 10:30 p.m. that night. *Id*. He explained that they arrived at Brake's trailer around 1:00 a.m. on June 30, 2006. *Id*. At that time, Dotson looked around and attempted to persuade Petitioner to enter the trailer and rob Brake. *Id*. Petitioner refused, and Dotson then retrieved a sawed-off, single-shot shotgun that he had brought and entered the trailer while Petitioner stayed outside. *Id*. Petitioner did not know where Dotson had obtained the gun. *Id*. According to Petitioner, he heard a gunshot approximately ten minutes later and started running for his Jeep before he falling down on a gravel pile. *Id*. He observed Dotson take two gasoline cans from the trailer's front porch and pour gasoline inside the trailer before lighting a piece of paper and tossing it inside. *Id*. He then saw flames coming from Brake's living room. *Id*. Dotson then ran to the Jeep holding what appeared to Petitioner believed to be a nine-millimeter handgun. *Id*.

Petitioner stated that he and Dotson drove back to Dotson's house. On the way, Dotson told Petitioner that he had "wasted" Brake by shooting him one time with the shotgun. *Id*. Dotson had thought Brake was asleep, but Brake pulled out the nine-millimeter handgun causing Dotson to shoot him. *Id*. Dotson had then grabbed Brake's handgun, a box of shells, and approximately one hundred dollars out of Brake's wallet. *Id*. Dotson gave Petitioner ten or fifteen dollars of Brake's money for gas. *Id*. When they arrived at Dotson's house, Petitioner and Dotson "sat around thinking." *Id*. Eventually, Dotson telephoned his girlfriend, and Petitioner went to sleep in his Jeep. *Id*. Petitioner said that Dotson gave the box of shells away when he got rid of the nine-millimeter gun. *Id*. He said that law enforcement should find a few shells from Brake's gun on the pool table at Dotson's home. *Id*. Petitioner admitted that he knew Brake had valuable property, but he asserted that he did not take anything because he did not want to steal from Brake. *Id*.

Law enforcement arrested Petitioner and Dotson after Petitioner made his third statement. *Id*. at *2. A search of Dotson's basement revealed two live rounds and a blackened, empty box of nine-millimeter ammunition. *Id*. A later search of Dotson's entire home revealed spent Winchester AA 410 shotgun shells in a closet and a drawer. *Id*. Law enforcement also searched Petitioner's car and found a Walmart receipt for the purchase of a box of Winchester AA 410 shotgun shells from just after midnight on June 30, 2006. *Id*. A Walmart surveillance video showed Dotson and James Cheaves with Petitioner when he purchased the shotgun shells. *Id*. The video also showed Petty, Dotson, and Cheaves leaving Walmart at approximately 12:06 a.m. on June 30, 2006. *Id*. A search of the woods behind Dotson's house led law enforcement to find a white Walmart bag with approximately twenty medicine bottles – some containing pills, some empty – prescribed to Brake. *Id*.

Jonathon Lott, who was dating Cheaves' sister at the time of the crime, testified that Cheaves asked him to discard a bag containing pieces of a gun a few weeks after Brake's death. *Id*. Lott threw the bag out of his truck window in Greenwood, Mississippi. *Id*. He said he did not know that he was discarding a murder weapon. *Id*. Lott told law enforcement about the bag and helped them find the trigger and the housing of the murder weapon. *Id*. Lott also testified that he went with Petitioner and Cheaves when they sold certain coins. *Id*.

Josh Yates, a classmate of Petitioner, Dotson, and Cheaves, informed law enforcement that he saw a sawed-off shotgun and shells in Petitioner's Jeep a few weeks before Brake was killed. *Id*. Yates testified that he saw Petitioner and Cheaves at Cheaves's home on the night of the crime and Petitioner told Yates that they were going to rob someone. *Id*. Yates told them they were crazy and returned home. *Id*. According to Yates, Petitioner later told him that they had robbed someone and had gotten "a few guns." *Id*. Yates also observed a flat screen television in the back of Petitioner's Jeep and a laptop computer at Cheaves's house. *Id*. Yates traded Roman Sensing for that laptop computer. *Id*. Yates also testified that he went with Petitioner and Cheaves to sell coins to a collector. *Id*. Next, Yates testified that he saw the shotgun at Cheaves' house sometime after June 30, 2006. *Id*. at *3. He observed Cheaves took the shotgun out of a shed near his house and tried to burn it in a nearby field. *Id*. Yates explained that Cheaves was able to burn the stock but not the metal parts of the gun. *Id*. Later, Yates saw Petitioner throw the sawed-off barrel of the shotgun out of his Jeep. *Id*. Finally, Yates admitted consuming pills given to him by Cheaves and Sensing. *Id*. He claimed not to know that the pills had belonged to Brake. *Id*.

Roman Sensing, also a classmate, testified that the day after Brake was killed, he got into the Petitioner's Jeep with Petitioner, Dotson, and Cheaves, and they drove by Brake's property. *Id*. According to Sensing, when they passed the burned trailer, Petitioner said that he, Dotson, and

Cheaves had killed Brake and set his trailer on fire. *Id*. Petitioner told Sensing that Dotson entered the trailer and shot Brake once in the chest with a shotgun before exiting the trailer and ejecting the shell. *Id*. Because that shot was not fatal, Dotson re-entered the trailer and shot Brake in the head. *Id*. Petitioner told Sensing that they robbed the victim and took all of his valuable items before setting his trailer on fire with gasoline from cans on the front porch. *Id*. Sensing said he saw a laptop, coins, pills, and flat screen television that Petitioner said came from Brake's house. *Id*. Petitioner also told Sensing that they had taken a handgun from the victim that was in Dotson's possession. *Id*. Petitioner gave Sensing the laptop because he owed him money, and Sensing then traded it to Yates. *Id*. Sensing also testified that he went with Petitioner, Dotson, and Cheaves when they sold Brake's coins. *Id*. Sensing possessed some of Brake's coins and gave them to law enforcement. *Id*. He also admitted consuming some of Brake's pills. *Id*. Sensing also saw Cheaves attempting to burn the shotgun used to kill Brake. *Id*. Finally, Sensing testified that Petitioner and Cheaves began wearing blue bandanas after Brake's death, which Petitioner said was a "gang thing" meaning you had killed someone. *Id*.

Classmate Jordan Sowards testified that he had seen a single-barrel shotgun in the basement of Dotson's home. *Id*. According to Sowards, Petitioner said that the shotgun had scratches on the barrel due to efforts to make it into a sawed-off shotgun. *Id*.

Finally, Karen Hall, Brake's friend and neighbor, testified that Brake originally owned a house and a trailer on the property. *Id*. However, on March 14, 2006, Brake's house burned in a fire. *Id*. Brake then asked Hall to go to the trailer and speak to Petitioner. *Id*. Hall told Petitioner that he would have to move out of the trailer so Brake could live there. *Id*. A short time later, Brake moved into the trailer. *Id*. Hall testified that Brake owned handguns, long guns, and two laptops,

and he had received an insurance check for over fifty thousand dollars to cover the fire damage to his house. *Id*. She also said Brake was known to tell everyone about his personal business. *Id*.

Evidence was admitted at trial showing that Brake had purchased a flat screen television and a laptop after his house burned down. *Id*. at *4. In addition, evidence was admitted showing that Brake had a coin collection and numerous guns. *Id*. None of these items were found at the scene of the trailer fire. *Id*. Brake's flat screen television was found at the house of Cheaves' father. *Id*.

Finally, Special Agent Danny Vaden of the Tennessee Bond and Arson Investigation section testified that the fire at Brake's trailer was caused by an accelerant like gasoline. *Id*. He believed that the fire started when someone poured gasoline into the center of the trailer. *Id*.

On direct appeal, Petitioner challenged the verdict on only one ground: that the trial court committed plain error by instructing the jury that his statement to law enforcement was a confession rather than an admission against interest. *Petty I*, *2013 WL* 510150, at *4. The TCCA affirmed. It determined that this issue was waived because it was not raised at trial, and also found that the instruction was not plain error. *See id*. at *4-5. The Tennessee Supreme Court denied review. (Doc. No. 12-20).

### B. Post-Conviction Proceedings

In his motion for post-conviction relief, Petitioner challenged his convictions and sentence on the basis that he received ineffective assistance of counsel when trial counsel failed to (1) move for a mistrial regarding juror misconduct; (2) file a motion to suppress the evidence found in the Petitioner's car; and (3) raise all grounds in the motion for new trial. (Doc. No. 12-24). The TCCA summarized the proof adduced at Petitioner's post-conviction evidentiary hearing as follows:

Petitioner's trial counsel testified that he had been a public defender for seventeen years and that he had handled over fifty murder trials. He recalled an incident that occurred during trial between one of the sequestered jurors and a waitress during a lunch break. It was determined that the waitress was the mother of one of the witnesses and that the juror and the waitress had a conversation about an ink pen. After learning about the incident, the trial court questioned the juror and determined that the facts of the case were not discussed. Trial counsel recalled that the court dismissed the juror "out of the abundance of caution but not because he actually thought that juror had been prejudicing anyone." Trial counsel did not ask the juror questions because he "didn't see any need to," and because the trial court had sufficiently questioned the juror.

Trial counsel confirmed that officers searched the Petitioner's car and found a Walmart receipt showing that the Petitioner purchased shotgun shells the night of the murder. Counsel also confirmed that the shotgun shells were the same type of shells that were used in the murder. Although trial counsel filed a motion to suppress the Petitioner's statement to officers, he did not move to suppress the search of the Petitioner's car. Trial counsel believed that the officers would have found out eventually about the Walmart purchase from the Petitioner's co-defendant because the co-defendant had been with the Petitioner at Walmart, had accepted a plea deal, and had given a proffer to the State. Trial counsel also recalled that the Petitioner gave officers consent to search his car and that there was no evidence that the consent was coerced or involuntary.

Trial counsel said that he did not file the Petitioner's motion for new trial and that he could not recall if he discussed the grounds for the motion with his co-counsel, who drafted and filed the motion. However, counsel testified that the motion "clearly was not sufficient . . . [b]ecause it left out all the things that needed to be taken up on appeal," such as challenging the denial of the motion to suppress the Petitioner's statement. Counsel opined that the Petitioner "did not get effective assistance of counsel on this motion."

The Petitioner testified that he did not ask his trial counsel to question the dismissed juror because he "wasn't aware that would be an issue." The Petitioner acknowledged that the conversation was only about an ink pen. The Petitioner also testified that he did not give officers consent to search his car. The Petitioner said that he asked officers if he could lock his car, but officers said they would "lock it up for [him]." However, the Petitioner also testified that he called his father to come get his car and that when his father arrived, "the vehicle had already been searched and pretty much trashed, destroyed, everything threw [sic] around in it."

*Petty II*, 2017 WL 3078312, at \*1-2. The post-conviction court denied relief. (Doc. No. 12-26).

On appeal, the TCCA also denied post-conviction relief. *Id*. at *2-4. The appeals court incorporated its lengthy summary of evidence from Petitioner's direct appeal, and provided the following abbreviated version:

> In short, the victim, Kenneth Brake, owned a trailer where the Petitioner had formerly lived. The victim's body was found in the trailer, which had been set on fire. It was determined that the victim died of a gunshot wound before the fire started. In a statement to officers, the Petitioner admitted to planning a robbery of the victim with a co-defendant, Thomas Dotson. However, the Petitioner said that he waited outside while Dotson shot the victim and then lit the trailer on fire.

*Petty II*, 2017 WL 3078312, at *1. First, the TCCA found that the trial counsel was not ineffective for failing to request a mistrial because the trial court adequately questioned the juror, the juror was excused, and there was no reason to believe that any improper conduct had occurred. *Id*. at *3. Second, the court held that deference was appropriately given to trial counsel's decision not to file a motion to suppress based upon (1) trial counsel's belief that Petitioner gave consent to officers to search his vehicle and, therefore, there was no legal basis to file a motion; (2) trial counsel's belief that Petitioner's co-defendant would have given officers the same information that the search of the Petitioner's vehicle revealed; and (3) the search of the vehicle was conducted after Petitioner was arrested. *Id*. at *4. Finally, the TCCA concluded that Petitioner failed to establish deficient performance or prejudice regarding the motion for a new trial. *Id*. The court specifically noted that failure to raise the denial of the motion to suppress Petitioner's confession was not ineffective assistance because trial counsel testified that the Petitioner's testimony at the suppression hearing left no basis for challenging his statement. *Id*. The Tennessee Supreme Court denied review. (Doc. No. 12-30).

### III. STANDARD OF REVIEW

#### A. Habeas Relief

The authority for federal courts to grant habeas corpus relief to state prisoners is provided by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). Under these governing principles, state courts are considered "adequate forums for the vindication of federal rights," *Burt v. Titlow*, 571 U.S. 12, 19 (2013), and "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003). Accordingly, "AEDPA . . . imposes a highly deferential standard [on the federal courts] for evaluating state-court rulings," *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation marks and citations omitted), and it acts as a "formidable barrier" to federal habeas relief for prisoners whose claims have been adjudicated in state court. *Burt*, 571 U.S. at 19.

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); 28 U.S.C. § 2254(a). The availability of federal habeas relief is further restricted where the petitioner's claim was "adjudicated on the merits" in the state courts. 28 U.S.C. § 2254(d). AEDPA presumes that state courts "know and follow [federal] law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam). A federal court may not grant relief unless a petitioner establishes that the state court decision "'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of the facts' in light of the record before the state

court." *Harrington*, 562 U.S. at 100 (quoting 28 U.S.C. § 2254(d)) (citation omitted); *Glover v. Phillips*, No. 3:17-cv-00761, 2019 WL 2724801, at *8 (M.D. Tenn. July 1, 2019). This standard is intentionally "difficult to meet." *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013); *Harrington*, 562 U.S. at 102.

A state court's decision is contrary to federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or when "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an "opposite" result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc). An unreasonable application of federal law occurs when the state court, having invoked the correct governing legal principle, "unreasonably applies the . . . [principle] to the facts of a prisoner's case." *Williams*, 529 U.S. at 409; *Hill*, 792 F.3d at 676. Under this standard, "whether the trial judge was right or wrong is not the pertinent question," *Gagne*, 680 F.3d at 513 (quoting *Renico*, 559 U.S. at 778 n.3), and "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly," *Williams*, 529 U.S. at 411. Rather, a federal court must find that the state court's application was objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *see also White v. Woodall*, 572 U.S. 415, 419 (2014) (explaining that not even "clear error" will not suffice).

For purposes of Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). This, too, is a "substantially high[ ] threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). The Sixth Circuit construes Section 2254(d)(2) together with Section 2254(e)(1)

12

to require a presumption that the state court's factual determination is correct in the absence of clear and convincing evidence to the contrary.[2] *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (citing *Miller-El*, 537 U.S. at 340). A state court's factual findings are therefore "only unreasonable where they are rebutted by clear and convincing evidence and do not have support in the record." *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted). Further, "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)). Accordingly, the pertinent question is not whether a federal court believes a state court's factual determination was incorrect, whether the "federal habeas court would have reached a different conclusion in the first instance," or whether "reasonable minds reviewing the record might disagree." *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)).

Under either path to relief under Section 2254(d), even "a strong case for relief" does not necessarily mean a state court's contrary conclusion is unreasonable. *Harrington*, 562 U.S. at 102 (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Gagne v. Booker*, 680 F.3d 493, 513-14 (6th Cir. 2012). AEDPA "demands that state-court decisions be given the benefit of the doubt." *Renico*, 558 U.S. at 773. Indeed, "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunction in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (internal quotations and citation omitted). Therefore, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

---

[2]     A state court's credibility determinations are also entitled to a presumption of correctness. *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2000).

decision." *Id*. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To secure relief, a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

### B.  Exhaustion and Procedural Default

Due to longstanding policies of comity and respect between state and federal courts, a habeas petitioner must "give the state courts the first opportunity to consider and rule upon the federal claims the prisoner wishes to use to attack [the] state court conviction." *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (citing *Picard v. Connor*, 404 U.S. 270, 275 (1971)). Thus, before a federal court may review the merits of a claim brought under § 2254, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); *Harrington*, 562 U.S. at 103. To be properly exhausted, a claim must be "fairly presented" through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848 (1999). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

"To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted). A petitioner need not cite federal law "book and verse" to the state court to fairly present a claim, *Pudelski*, 576 F.3d at 605 (citing *Picard*, 404 U.S. at 278), but the factual and legal underpinnings of the claim must be presented to "alert[ ] that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted); *see also Gray v. Netherland*, 518 U.S. 152, 162-

63 (1996) (explaining that the substance of each federal constitutional claim must be presented to the state court, not just the facts necessary to state a claim for relief); *Pillette v. Foltz*, 824 F.2d 494, 497-98 (6th Cir. 1987) (a petitioner does not exhaust his state remedies for all ineffective assistance of counsel claims if the state courts are presented with only one aspect of counsel's performance).

The exhaustion requirement works together with the procedural-default doctrine, which generally bars federal habeas review of claims that were procedurally defaulted in the state courts. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017); *O'Sullivan*, 526 U.S. at 848. A petitioner procedurally defaults his claim where he fails to properly exhaust available remedies (that is, fails to fairly present the claim through one complete round of the state's appellate review process), and he can no longer exhaust because a state procedural rule or set of rules have closed off any remaining state court avenue for review of the claim on the merits. *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)). Procedural default also occurs where the state court "actually . . . relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). The procedural default doctrine "appl[ies] alike whether the default in question occurred at trial, on appeal, or on state collateral attack." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Murray v. Carrier*, 477 U.S. 478, 490-492 (1986)).

However, to ensure that "fundamental fairness [remains] the central concern of the writ of habeas corpus," *Strickland v. Washington*, 466 U.S. 668, 697 (1984), courts recognize an equitable

15

exception by which a petitioner may overcome a procedural default and receive federal habeas review. *Dretke v. Haley*, 541 U.S. 386, 392 (2004). To overcome a procedural default, a petitioner may show "good cause for the default and actual prejudice from the claimed error." *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019) (citing *Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992)); *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014) (citing *Coleman*, 501 U.S. at 754).

A petitioner may establish cause by "show[ing] that some objective factor external to the defense" – a factor that "cannot be fairly attributed to" the petitioner – "impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Attorney error does not constitute cause unless it is constitutionally ineffective assistance of counsel. *Edwards*, 529 U.S. at 451-52; *Benton*, 942 F.3d at 307-08; *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). Generally, however, a claim of ineffective assistance must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.[3] *Murray*, 477 U.S. at 489.

Ineffective assistance of post-conviction counsel may establish cause under two circumstances. First, the complete abandonment by counsel during state post-conviction proceedings without notice to a petitioner may establish cause to excuse default. *Maples v. Thomas*, 565 U.S. 266, 288-89 (2012). Second, the ineffective assistance of post-conviction counsel may establish the cause needed to excuse procedural default regarding substantial claims of ineffective assistance of trial counsel. *Martinez v. Ryan*, 566 U.S. 1, 17 (2012); *Trevino v.*

---

[3]     If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards*, 529 U.S. at 452-53.

*Thaler*, 569 U.S. 413, 429 (2013); *see also Sutton*, 745 F.3d at 792 (holding that *Martinez* and *Trevino* apply in Tennessee).

If cause is established, a petitioner must also demonstrate actual prejudice.[4] To do so, a petitioner must demonstrate that the constitutional error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (emphasis in original) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). This means that "a petitioner must show not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (citations omitted); *Frady*, 465 U.S. at 170. "[T]he prejudice component . . . is not satisfied if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim." *Rust*, 17 F.3d at 161-62.

In the alternative, because cause and prejudice is not a perfect safeguard against fundamental miscarriages of justice, a court may overlook those requirements if a petitioner presents an "extraordinary case" whereby a constitutional violation "probably resulted" in the conviction of someone who is "actually innocent" of the substantive offense. *Dretke*, 541 U.S. at 392; *Benton*, 942 F.3d at 307. The petitioner's burden on this claim is "extraordinarily high." *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). Actual innocence requires a petitioner to demonstrate that it is more likely than not that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). The court's function "is not to make an independent factual determination about what likely occurred," but rather "to assess the likely impact of the [total] evidence on reasonable jurors." *Bell*, 547 U.S. at 538.

---

[4]      If a petitioner fails to establish cause, a court need not address the issue of prejudice. *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

17

## IV.  ANALYSIS

With these principles in mind, the court turns to an examination of the four claims raised

in the Petition. The Court addresses each in turn.

### A.  Claim One: The Trial Court Gave an Erroneous Jury Instruction on Confession Rather than Admission Against Interest

In his first claim, Petitioner argues that the trial court erred by instructing the jury on

confession rather than admission against interest. The challenged instruction stated:

> Evidence of a confession has been introduced in this case. A confession is a statement by the Defendant that he engaged in conduct which constitute[s] the crime charged and it is acknowledgement of guilt in itself. The Court has ruled that the confession is admissible in evidence, but it is your duty to judge its truth. In so judging, you should consider the circumstances under which a confession was obtained, as well as any evidence which contradicts all or any part of the statements made. You must consider all the statements made by the Defendant, whether favorable or unfavorable to him. You must not disregard any of them without good reason. If the evidence in the case leads you to believe that the confession or any part of it is untrue or was never made, you should disregard it or that portion which you do not believe. You are the sole judges of what weight should be given to portions of the confession that you believe and you should consider them along with all the other evidence in the case in determining the Defendant's guilt or innocence.

(Doc. No. 12-9 at 119-20). Petitioner contends that he "never admitted to engaging in conduct

which would constitute first-degree murder[; r]ather, he   . . . dr[o]ve to the residence of the now

'deceased' with his co-defendant, intending to commit *burglary*." (Doc. No. 1 at 21 (emphasis in

original)). Petitioner claims that he "had a change of heart and backed out" upon learning that

"someone may be/would be shot." (*Id*. at 21-22). Thus, Petitioner argues, while the admitted facts,

taken together with other facts of the case, "may shallowly establish a level of guilt of some kind[,]

they do not amount to a confession," and Petitioner argues that he did not offer "an

acknowledgment of guilt itself." (*Id*. at 21-22). Petitioner contends the trial court's use of a

confession instruction therefore constituted "inappropriate commenting on the evidence" that

18

violated his due process rights. (*Id*. at 22-23). In response, the State argues that this claim is not cognizable and procedurally defaulted. (Doc. No. 13 at 13-15).

The Court finds that this due process claim is procedurally defaulted. Petitioner raised the confession jury instruction on direct appeal solely on the basis of an asserted error of state law. (Doc. No. 12-14 at 13-16). Specifically, Petitioner argued that the trial judge misapplied Tennessee law in selecting the confession jury instruction over the instruction for admission against interest. He relied upon the Tennessee Criminal Practice and Procedure treatise, (*see id*. at 13-14 (citing 10 Tenn. Crim. Prac. & Proc. § 19:54 (2010-2011) (contrasting confession and admission against interest for purposes of Tennessee jury instructions)), as well as Tennessee caselaw similarly focused on state law. *See id*. at 14-15 (citing *Helton v. State*, 547 S.W.2d 564, 567 (1977) (explaining the distinction between a confession and an admission under state law), *overruled on other grounds by State v. Cabbage*, 571 S.W.2d 832 (Tenn. 1978); *State v. Lee*, 631 S.W.2d 453, 455 (Tenn. Crim. App. 1982) (explaining what is necessary to qualify as a "confession" under state law; *State v. Phillips*, 728 S.W.2d 21, 27 (Tenn. Crim. App. 1986) (defining confession and admission against interest under state law)). Petitioner did *not* contend on appeal that his constitutional due process rights had been violated. (Doc. No. 12-14 at 13-16). Indeed, in his brief on direct appeal the words "due process" were never mentioned in connection with the disputed jury instruction, and similar concepts were not invoked.[5] *Id*. Thus, it does not appear that the TCCA considered that question, as required, in the first instance. *See Petty I*, 2013 WL 510150, at *4-5 (considering whether the challenged jury instruction "fairly submitted the legal issues" and

---

[5]    The Tennessee caselaw relied upon by Petitioner also did not reference federal law or due process in relation to this issue. Neither *Helton* nor *Lee* mention due process rights at all, *see Helton*, 547 S.W.2d at 567 & *Lee*, 631 S.W.2d at 455, and *Phillips* mentions due process once in connection with an entirely different issue. *See Phillips*, 728 S.W.2d at 27 (finding no denial of due process concerning motion for ballistics expert).

19

"contained a proper statement of the applicable law"). Accordingly, because Petitioner did not present a federal due process claim "under the same theory" to the state courts, *Wagner*, 581 F.3d at 417, he did not "alert[] that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (citations omitted); *see also Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Even if the Court were to reach the merits of this claim, however, Petitioner would not be entitled to relief. The fact that a jury instruction was allegedly incorrect under state law is not alone a sufficient basis for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991). Federal courts do not grant habeas relief simply because an instruction may have been deficient. *Id*. Indeed, it is insufficient that an instruction may be "undesirable, erroneous, or even universally condemned." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (citations omitted); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Further, it is not enough that there is some "slight possibility" that the jury misapplied an instruction. *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009) (quoting *Weeks v. Angelone*, 528 U.S. 225, 236 (2000)). Rather, habeas relief may be granted based on errors in state jury instructions only in "extraordinary cases," *Daniels*, 501 F.3d at 741 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)), where "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."[6] *Estelle*, 502 U.S. at 72 (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

---

[6]     A challenged instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147).

20

Here, "it is not clear that the instruction [Petitioner] challenges is even inaccurate." *Daniels*, 501 F.3d at 742. Evidence was admitted at trial that Petitioner indeed confessed to engaging in conduct that constitutes the crimes charged. Specifically, the State introduced Petitioner's third interview with law enforcement, during which he was asked to confirm his written statement. (*See* Doc. No. 12-7 at 63; 12-10 at 59-71). Therein, Petitioner admitted that he and Thomas Dotson "decided to go and rob Mr. Brake" to get money; that Petitioner refused to go inside and waited outside while Dotson took a shotgun inside; that Petitioner heard a shot and Dotson came out; Petitioner watched Dotson pour gasoline on Brake's trailer and light it on fire; and Dotson told Petitioner he had shot Brake. (Doc. No. 12-10 at 59-60). Other witnesses corroborated this statement by testifying that Petitioner had described his participation in the crimes, had been in possession of property taken from Brake's trailer, and had disposed of evidence from the crime scene.

Accordingly, Petitioner's third statement was reasonably understood as a confession to the consummated offenses of arson and first-degree felony murder, not an admission against interest. *See* Tenn. Code Ann. §§ 39-14-301(a)(1) (defining arson as "knowingly damaging any structure by means of a fire or explosion without the consent of all persons who have a possessory, proprietary or security interest therein); 13-202(a)(2) (defining first-degree felony murder as a killing of another "committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft . . ."); *Helton*, 547 S.W.2d at 567 (explaining that a "confession" is a statement by the accused that he engaged in conduct that constitutes a crime, while an admission is "something less than a confession," such as an acknowledgement by the accused of certain facts that tend together with other facts to establish guilt). This conclusion holds true despite Petitioner's argument that he did not go into the trailer

with Dotson. *See* Tenn. Code Ann. § 39-11-402 (a person is criminally responsible for an offense committed by the conduct of another, if, acting with intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense, he aids or attempts to aid another person to commit the offense).

Second, even assuming *arguendo* that the instruction is inaccurate, Petitioner has not demonstrated prejudice because there is no evidence that the instruction "so infected the entire trial that the resulting conviction violates due process." *Daniels*, 501 F.3d at 742 (quoting *Cupp*, 414 U.S. at 147). Tennessee courts evaluate the appropriateness of jury instructions "in the context of the charge as a whole." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014) (citing *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008)). A defendant cannot show error unless the instruction alone infected the entire trial or the entire charge failed to fairly submit the legal issues or misled the jury as to the applicable law. *Id*. (citations omitted). Here, as required, the jury charge "describe[d] and define[d] each element of the offense or offenses charged." *Id*. (citing *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005)); (Doc. No. 12-9). Further, the confession instruction contained extensive cautionary language advising the jury that it alone was the judge of the truthfulness of Petitioner's confession in the context of all evidence presented, and that the jury should assign whatever weight it deemed appropriate to whatever portion of the confession, if any, it believed. Accordingly, the trial judge did not instruct the jury to find that the confession was truthful or direct it to give the confession any particular weight. Furthermore, the jury instructions as a whole did not relieve the government of its burden to prove the elements of the charges.

Petitioner is not entitled to relief on this claim.

## B. Ineffective Assistance of Counsel Claims

### 1. Legal Standards

"The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel." *Glover*, 2019 WL 2724801, at *10; *Strickland*, 466 U.S. at 686 (citing *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)). To prevail on a claim of constitutionally ineffective assistance of counsel, the petitioner must show (1) deficient performance of counsel and (2) prejudice. *Premo v. Moore*, 562 U.S. 115, 121 (2011); *Bell v. Cone*, 535 U.S. 685, 694-95 (2002); *Strickland*, 466 U.S. at 687. A court may address performance and prejudice in any order, and may end its inquiry if one requirement is not met. *Strickland*, 466 U.S. at 697.

"Judicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, because reasonable attorneys may disagree on the most appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). Courts must therefore apply a "strong presumption" that a lawyer's conduct in discharging his duties "falls within the wide range of reasonable professional assistance." *Id.* at 570 (quoting *Strickland*, 466 U.S. at 689); *Harrington*, 562 U.S. at 104. To establish that trial counsel's performance is constitutionally deficient, a petitioner must show that it falls below an objective standard of reasonableness, *Richardson v. Palmer*, 941 F.3d 838, 856 (6th Cir. 2019) (citing *Strickland*, 466 U.S. at 686-87), as measured by "prevailing professional norms." *Bigelow*, 367 F.3d at 570 (quoting *Strickland*, 466 U.S. at 687-88). In assessing counsel's performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466

U.S. at 690-91. A court must judge the reasonableness of counsel's challenged conduct on the totality of evidence of a particular case, viewed as of the time of counsel's conduct. *Id.* at 695.

The prejudice element requires a petitioner to show that there is a "reasonable probability" that the result of the trial would have been different but for counsel's unprofessional errors. *Bigelow*, 367 F.3d at 570 (quoting *Strickland*, 466 U.S. at 694); *Premo*, 562 U.S. at 122. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "while the petitioner need not conclusively demonstrate his 'actual innocence,' the focus should be on whether the result of the trial was 'fundamentally unfair or unreliable,'" *Bigelow*, 367 F.3d at 570 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)), or "infect[ed] . . . with error of constitutional dimensions." *Richardson*, 941 F.3d at 856 (quoting *Murray*, 477 U.S. at 494).

On habeas review, this is a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt*, 571 U.S. at 15 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)); *Richardson*, 941 F.3d at 856. Accordingly, when a petitioner raises an exhausted ineffective-assistance claim in a federal habeas petition, the "pivotal question" is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. As the Supreme Court has explained:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted); *see also Richardson*, 941 F.3d at 856 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."). Thus, while "surmounting *Strickland's* high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 586 U.S. at 105.

With these principles in mind, the Court addresses Petitioner's three ineffective assistance of counsel claims.

### 2. Claim Two: Trial Counsel Failed to Object and Move for a Mistrial Based on Juror Misconduct

Petitioner argues that trial counsel was constitutionally ineffective when he failed to move for a mistrial based on juror misconduct. (Doc. No. 1 at 11). This claim concerns an incident in which a sequestered juror had contact with the mother of a witness in her capacity as a waitress. The record reflects that, upon learning of this interaction, the trial court engaged in *voir dire* of the juror with counsel present. (Doc No. 12-8 at 98-100). When questioned, the juror stated the conversation with the waitress was limited to his asking for an ink pen and the waitress's responding that she did not keep pens for customers. (*Id.* at 99.) A court officer intervened to prevent any further interaction. (*Id.*) The court inquired if the juror spoke with any other jurors about the conversation. (*Id.*) The juror explained that other jurors were sitting near him, but he did not discuss the interaction with them. (*Id.* at 99-100). The trial court immediately excused the juror. (*Id.*)

At the post-conviction evidentiary hearing, trial counsel explained that he believed he did not need to question the juror because the trial judge "covered it, and you have to take the juror at

25

their word. The juror said the conversation was in regard to an ink pen and nothing was discussed about the facts of the case." (Doc. No. 12-22 at 10). Trial counsel agreed with the prosecutor that the court's *voir dire* "determined to everyone's satisfaction that there was not anything discussed that had anything to do with the trial." (*Id*. at 39). Trial counsel saw no reason to raise the issue again, especially because the court had dismissed the juror "out of the abundance of caution." (*Id*.) The TCCA found that the trial court adequately questioned the juror, the juror was excused, and there was no reason to believe that any improper conduct had occurred. *Petty II*, 2017 WL 3078312, at *3. The TCCA rejected Petitioner's argument that "everything was not done" to confirm that the juror was being honest about the conversation and that the other jurors were not prejudiced, and it concluded that trial counsel made an acceptable strategic decision not to seek a mistrial. *Id*.

Petitioner contends that trial counsel should have objected to the trial judge's personally questioning the juror about the contact with the waitress. (*Id*. at 24-25). He argues that trial counsel should have demanded a hearing pursuant to *Remmer v. United States*, during which he could have questioned the juror for truthfulness, questioned other jurors to determine if they had been "impacted by this extraneous influence," and "demonstrated actual bias." (*Id*.) While Petitioner concedes that "how and whether to have a hearing on a claim that the jurors were improperly exposed to extraneous information is with the trial court's sound discretion," he contends that an objection from trial counsel would have resulted in *Remmer* hearing. (*Id*.) Without one, Petitioner contends he is entitled to "overcome" the presumption of the remaining jurors' impartiality. (*Id*. at 26). This claim is properly exhausted. *See Petty II*, 2017 WL 3078312, at *3. Respondent argues that the state court's rejection of this claim was not based on an objectively unreasonable application of clearly-established Supreme Court precedent. (Doc. No. 13 at 16-19).

The court finds that Petitioner has not shown that he is entitled to relief on this claim because the determination of the TCCA was not contrary to *Strickland*. Nor was the TCCA's conclusion based on an unreasonable determination of the facts or an unreasonable application of *Strickland* to those facts.

First, the Court must presume the correctness of the state court factual determinations because Petitioner has made no attempt to challenge them with clear and convincing evidence. Regardless, the trial record confirms these determinations. It reflects that the Court adequately questioned the juror and determined that the other jurors were not prejudiced by the conversation about the ink pen. (*See* Doc No. 12-8 at 98-100).

Second, the TCCA reasonably concluded under *Strickland* that trial counsel's performance was not deficient. A trial court has an obligation to investigate a colorable claim of external influence on the jury to determine whether any external influence occurred and, if so, whether it was prejudicial. *Remmer v. United States*, 347 U.S. 227, 229-30 (1954); *United States v. Lanier*, 870 F.3d 546, 549-50 (6th Cir. 2017). The general rule is that "'[w]here a *colorable* claim of extraneous influence has been raised,'" the court must hold a *Remmer* hearing "to afford the defendant an opportunity to establish actual bias." *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (emphasis added) (quoting *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)). However, "a *Remmer* hearing is not necessary in every instance of possible unauthorized third-party contact." *Lanier*, 870 F.3d at 549 (citing *Davis*, 177 F.3d at 557). "[A]n allegation of an unauthorized communication with a juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict," such as when the allegation "involv[es] claims of 'intentional improper contacts or contacts that had an obvious potential for improperly

influencing the jury.'" *Id.* (quoting *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997). Accordingly, *Remmer* does not govern here.

On habeas review, matters of trial strategy are usually left to counsel's discretion. *Dixon v. Houk*, 737 F.3d 1003, 1012 (6th Cir. 2013). "[S]trategic choices made after a thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Here, the trial court questioned the juror in front of Petitioner and trial counsel to trial counsel's satisfaction, ascertained that the brief conversation between the juror and the waitress did not concern Petitioner's case at all, and dismissed the juror out of an abundance of caution. The Court concludes that trial counsel reasonably determined that there was no further investigation to be conducted or action to be taken because the incident did not have any likelihood of affecting the verdict. The Court agrees with the TCCA that trial counsel's strategy not to object and not to file a motion for a mistrial does not fall below an objective standard of reasonableness as measured by prevailing professional norms. *Strickland*, 466 U.S. at 686-88; *Richardson*, 941 F.3d at 856; *Bigelow*, 367 F.3d at 570.

Furthermore, Petitioner has also not demonstrated prejudice. The juror's unrebutted testimony was that he did not discuss his brief interaction with the waitress with other jurors, and he was immediately dismissed. The Court can discern no reason the trial court would have granted a motion for a mistrial had one been made by trial counsel. Thus, Petitioner has not demonstrated that there was a reasonable probability that the result of the trial would have been different had such a motion been filed. *Bigelow*, 367 F.3d at 570 (quoting *Strickland*, 466 U.S. at 694).

Petitioner is therefore not entitled to habeas relief on this claim.

3. Claim Three: Trial Counsel Failed to File a Motion to Suppress Evidence Found During the Search of Petitioner's Vehicle

In his third claim, Petitioner argues that trial counsel was constitutionally ineffective for failing to move to suppress evidence – specifically a Walmart receipt for shotgun shells – found by law enforcement during a search of his vehicle. (Doc. No. 1 at 11, 26). At Petitioner's trial, Detective B.J. Gafford testified that Petitioner was arrested on the night of July 12, 2006, after he gave his third statement to law enforcement. (Doc. No. 12-7 at 93). Gafford then left to arrest Thomas Dotson, and later returned to deal with Petitioner's vehicle. He testified as follows:

> Q: Was his vehicle still there?
> A: Yes, it was.
> Q: What did you do with his vehicle?
> A: We obtained a consent from Mr. Petty to search his vehicle; and he gave us the key to search his vehicle. We were going to have to since we had left the area and came back again we were going to have to tow the vehicle because it was in the parking lot of the training division and they would be doing business there the next day. Would couldn't just leave it sitting there, so we did an inventory search on the vehicle. Left there and went over to the sheriff's department which is just right down the road a little ways. We were going to call a wrecker to come and get the vehicle but when we got to the sheriff's department Mr. Petty's dad was there and asked if we would relinquish the vehicle to him after getting consent from Mr. Petty. We did relinquish the vehicle to Mr. Terry Petty, the defendant's dad.

(*Id.* at 104-05). On cross-examination, Gafford confirmed that he obtained consent to search the vehicle. (Doc. No. 12-8 at 157-58). During the search, Gafford found a Walmart receipt for the purchase of shotgun shells on the front floorboard. (Doc. No. 12-7 at 106).

At the post-conviction evidentiary hearing, Petitioner testified that he did not consent to the search of his vehicle. (Doc. No. 12-22 at 65-66). However, trial counsel testified that he believed the proof established that the police "requested consent to search the vehicle and were given consent." (*Id.* at 14-15, 40-41). Trial counsel thought that the granting of consent was connected to Petitioner's agreement to cooperate with the State. (*Id.* at 15). He testified that there

was "no indication from talking to Mr. Petty that it was a coerced consent, that it was not voluntary consent, or that he had limited them to looking in just the floorboards or anything like that. So I didn't see a voluntary consent issue. . . . It appeared to just be a valid consent search." (*Id*. at 40-41). Trial counsel also testified that he believed law enforcement would have discovered the same evidence because they "had worked out a deal with Mr. Cheaves and taken a proffer from Mr. Cheaves."[7] (*Id*. at 12-14, 41).

The post-conviction court found that trial counsel did not provide ineffective assistance and denied relief. (Doc. No. 12-21 at 76-77). Although the court acknowledged that Petitioner claimed to have denied consenting to a search of his vehicle, it credited the testimony of law enforcement at trial that Petitioner "gave consent to search the vehicle along with the key and the police arrested him when he was in possession of the vehicle and performed an inventory search." (*Id*. at 76). The court found that Petitioner failed to carry his burden on both deficient performance and prejudice because he consented to the search, the search was permissibly conducted to inventory the vehicle after his arrest, and James Cheaves' statements would have legally enabled law enforcement to obtain the same evidence pursuant to the independent source and inevitable discovery doctrines. (*Id*. at 76-77).

On appeal, the TCCA also concluded that trial counsel's failure to move to suppress evidence seized from Petitioner's vehicle was not deficient performance. *Petty II*, 2017 WL 3078312, at *4. The appeals court cited trial counsel's testimony that he believed Petitioner gave consent to officers to search his car and thus there was no legal basis to file a motion to suppress, as well as Petitioner's testimony that the search of his car was conducted after he was arrested. *Id*. The TCCA also credited trial counsel's testimony that Cheaves would have given officers the same

---

[7]     Cheaves was present at the Walmart with Petitioner and Dotson. *Petty I*, *2013 WL* 510150, at *2.

information that the search of Petitioner's car revealed – i.e., that Petitioner had been to Walmart shortly before the murder and had purchased the same ammunition that was used to shoot the victim. *Id*.

Petitioner relies upon trial counsel's testimony at the evidentiary hearing that a motion to suppress "maybe" should have been filed to preserve the issue of the search of the vehicle for appeal. (Doc. No. 1 at 26 (citing Doc. No. 12-22 at 15)). This claim is properly exhausted. *See Petty II*, 2017 WL 3078312, at *3. Respondent argues that the state court's rejection of this claim was based on neither an unreasonable determination of the facts in light of the evidence, nor an objectively unreasonable application of *Strickland*. (Doc. No. 13 at 19-21).

The Court finds that Petitioner has not shown that he is entitled to relief on this claim because the determination of the TCCA was not unreasonable under *Strickland*. Nor was the TCCA's conclusion based on an unreasonable determination of the facts or an unreasonable application of *Strickland* to those facts.

First, the Court must presume the correctness of the state court factual determinations because Petitioner has made no attempt to challenge them with clear and convincing evidence. Once again, the record confirms these determinations. The trial record reflects the testimony of law enforcement that Petitioner consented to the vehicle search after his arrest, and the record of the evidentiary hearing reflects that trial counsel believed both that there were no questions at trial about the legality of the vehicle search, and that law enforcement would nonetheless have learned about Petitioner's presence at the Walmart from Cheaves.

Petitioner has also offered no basis to challenge the state courts' credibility determinations, which are entitled to a similar presumption of correctness. *Skaggs*, 235 F.3d at 266. Indeed, a federal habeas court "may not lightly ignore" a state court's "credibility findings; they are entitled

to 'great deference' and 'must be sustained unless [they are] clearly erroneous,' particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (quoting *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam)). The post-conviction court and TCCA both made credibility determinations in favor of Detective Gafford's testimony that Petitioner granted consent and in favor of trial counsel's testimony that he believed, based on his interactions with Petitioner, that it was a voluntary consent search. In particular, the post-conviction court "had the opportunity to assess the credibility of [Petitioner] firsthand," *Howell*, 710 F.3d at 386, and it implicitly discounted his credibility concerning the assertion that he refused consent. Other than an implied bare assertion to the contrary, Petitioner has offered no basis for the Court to conclude that the state courts' credibility determinations were clearly erroneous.

Based upon the evidence and credibility determinations, the state courts did not unreasonably apply *Strickland* in concluding that trial counsel's performance was not deficient. The Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. *State v. Brewer*, No. M2018-00566-CCA-R3-CD, 2019 WL 5095738, at *6 (Tenn. Crim. App. Oct. 11, 2019). Under both constitutions, a warrantless search or seizure is presumed unreasonable unless it is conducted under one of the narrowly defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000); *State v. Simpson*, 968 S.W.2d 776, 780 (Tenn. 1998). Consent to search is a primary exception to the warrant requirement. *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008); *State v. Phifer*, No. M2013-01401-CCA-R3-CD, 2014 WL 4698499, at *14 (Tenn. Crim. App. Sept. 23, 2014). While other counsel might have determined the best course of action was to file a motion to suppress despite the evidence of Petitioner's consent presented at trial, the state courts reasonably concluded under *Strickland* that trial counsel's decision not to file such a motion did

not fall below an objective standard of reasonableness as measured by prevailing professional norms.[8] *Strickland*, 466 U.S. at 686-88; *Richardson*, 941 F.3d at 856; *Bigelow*, 367 F.3d at 570.

Furthermore, Petitioner has not demonstrated prejudice. Petitioner has advanced no compelling argument that a motion to suppress would have been granted given Detective Gafford's testimony. Thus, Petitioner has not demonstrated that there was a reasonable probability that the result of the trial would have been different had trial counsel filed the motion. *Bigelow*, 367 F.3d at 570 (quoting *Strickland*, 466 U.S. at 694).

Petitioner is therefore not entitled to habeas relief on this claim.

### 4. Claim Four: Trial Counsel Did Not Raise All Available Grounds in the Motion for a New Trial

In his final claim, Petitioner argues that trial counsel was constitutionally ineffective for failing to raise all available grounds in his motion for a new trial. (Doc. No. 1 at 11, 26-27). Co-counsel for Petitioner raised three specific issues in the motion for a new trial: sufficiency of the evidence, erroneous jury instruction on criminal responsibility, and juror misconduct.[9] (*See* Doc. No. 12-2 at 7-11). After a hearing, the trial court denied the motion. (Doc. No. 12-4 at 47).

In his post-conviction petition, Petitioner asserted that his trial co-counsel was ineffective for failing to "raise all reasons that a new trial should be granted." (Doc. No. 12-21 at 60). He specifically identified four omitted issues: juror misconduct, the search of Petitioner's vehicle, erroneous jury instruction on criminal responsibility, and the State's referring to Petitioner as a "gang leader." (*Id*. at 59-60). At the evidentiary hearing, trial counsel testified that he advised Ms. Crabtree that "[a]nything that was objected to at trial should have been placed in [the motion] to

---

[8]     Accordingly, the Court need not address application of the exception for an inventory search incident to arrest or the doctrine of inevitable discovery.

[9]     The motion for a new trial was authored and filed by trial co-counsel, Rhonda Crabtree. (Doc. No. 12-22 at 24).

preserve that on appeal."[10] (Doc. No. 12-22 at 26). However, trial counsel believed his co-counsel's work on the motion "not sufficient," because this did not occur. (*Id*. at 26-27). In particular, trial counsel asserted that the denial of the motion to suppress Petitioner's confession should have been included in the motion for a new trial. That ruling turned on the credibility of the witnesses regarding whether law enforcement made any promises to Petitioner that "he would not be looking at a first degree murder conviction if he cooperated." (*Id*. at 26, 46-47). However, trial counsel conceded that the trial judge would have been in the best position to judge credibility, and he acknowledged that Petitioner did not testify that he was given a specific inducement. (*Id*. at 46-47, 54). The post-conviction court denied relief. It found the motion for a new trial "somewhat deficient," but concluded that Petitioner had not demonstrated prejudice because he "was not denied a complete appellate review on direct appeal and there was no evidence of an actual adverse effect." (Doc. No. 12-21 at 81-83).

On appeal to the TCCA, Petitioner argued that the motion for a new trial "did not provide grounds that should have been preserved on appeal." (Doc. No. 12-24 at 16). However, the only specific issue identified by Petitioner was the denial of the motion to suppress the confession. (*See id*. at 16-18). Accordingly, the TCCA found that Petitioner contended only this one specific issue should have been included in the motion for a new trial. *Petty II*, 2017 WL 3078312, at *4. Relying on trial counsel's testimony that Petitioner contradicted this theory at the suppression hearing and "left no basis for challenging his statement to officers," the TCCA held that Petitioner had demonstrated neither deficient performance nor prejudice. *Id*.

Liberally construed, the Petition contends that trial counsel failed to raise seven grounds in the motion for a new trial: (1) erroneous jury instruction; (2) juror misconduct; (3) insufficient

---

[10]     Although co-counsel Crabtree was present, Petitioner declined to call her to testify at the post-conviction evidentiary hearing. (*Id*. at 61-62).

34

evidence; (4) the State's referring to Petitioner as a "gang leader;" (5) juror Brittany Edwards's "knowingly l[ying]" during *voir dire*; (6) denial of the motion to suppress Petitioner's statements to law enforcement; and (7) the search of Petitioner's vehicle. (Doc. No. 1 at 26-27). Petitioner relies on trial counsel's testimony that Petitioner "did not get effective assistance of counsel on this motion" authored by co-counsel. (*Id*. at 27). Respondent argues that the state court's rejection of this claim was based on neither an unreasonable determination of the facts in light of the evidence, nor an objectively unreasonable application of *Strickland*. (Doc. No. 13 at 21-23).

As a threshold matter, Petitioner is not entitled to habeas relief on the portions of Claim Four that contend trial counsel was ineffective for failing to raise three of the seven identified issues – i.e., sufficiency of the evidence, erroneous jury instruction on criminal responsibility, and juror misconduct – because he *did*, in fact, raise these issues in the motion for a new trial. (*See* Doc. No. 12-2 at 7-11).

Next, the portions of Claim Four based on failure to raise another three issues – i.e., the State referring to Petitioner as a "gang leader," juror Brittany Edwards's lying during *voir dire*, and the search of Petitioner's vehicle – are unexhausted because they were not raised in the TCCA. *See Edwards*, 529 U.S. at 451 (explaining that principles of exhaustion and default apply to trial, appeal, and state collateral attack). As discussed, Tennessee law "generally bars second postconviction proceedings," *In re Hall*, 795 F. App'x at 944, and the time for the petitioner to raise this claim to the state courts has passed. *See* Tenn. Code Ann. §§ 40-30-102(a), (c); 40-30-106(g). Further, none of the limited statutory provisions for reopening a first postconviction proceeding apply in the petitioner's case. *See id*. § 40-30-117. Thus, the unexhausted portions of Claim Four are procedurally defaulted because they can no longer be presented to the Tennessee courts. *Atkins*, 792 F.3d at 657.

Petitioner has offered no basis to excuse this default, and none is apparent. Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance of counsel at trial. *Martinez*, 566 U.S. at 9; *Sutton*, 745 F.3d at 792. However, *Martinez* does not apply here, for two reasons. First, the issues regarding the search of Petitioner's vehicle and the State's referring to Petitioner as a "gang leader" were raised at the post-conviction initial review stage and defaulted on post-conviction appeal. *Martinez*, however, only applies to claims that were defaulted at the initial review stage of collateral proceedings. *Martinez*, 566 U.S. at 16. As a result, *Martinez* does not even apply to those two issues that were raised Petitioner's post-conviction petition but not raised on post-conviction appeal (i.e., the search of Petitioner's vehicle and the State's referring to Petitioner as a "gang leader"). *West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015); *see also Rogers*, 2019 WL 1331035, at *101 (explaining that *Martinez* "does not apply to claims that . . . were defaulted at some stage other than initial review, even when Petitioner claims they were presented poorly at initial-review proceedings). Second, *Martinez* does not apply because this entire claim concerns the alleged ineffective assistance of counsel in connection with a motion for a new trial. The Supreme Court has broadly rejected the argument that *Martinez* applied to claims of ineffective assistance on direct appeal. *Davila v. Davis*, 137 S. Ct. 2058, 2066 (2017). "Once a defendant has been found guilty and sentenced, he is no longer a 'presumptively innocent defendant' facing 'the danger of conviction,' about whom *Martinez* is concerned. *Rogers v. Westbrooks*, No. 3:13-cv-00141, 2019 WL 1331035, at * 101 (M.D. Tenn. Mar. 25, 2019) (quoting *Martinez*, 566 U.S. at 12; *Davila*, 137 S. Ct. at 2066-67). Thus, "*Martinez* does not apply to claims of post-trial ineffectiveness." *Id.* (citing *Milam v. Davis*, 733 F. App'x 781, 784, 786 (5th Cir. May 10, 2018), *cert. denied*, 139 S. Ct. 335 (2018) (applying *Davila* to hold that *Martinez* does not apply to claim

36

of ineffectiveness in motion for new trial and on appeal); *see also Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) (noting that *Martinez* should not be read more broadly than the Supreme Court intended). Thus, the Court may not consider these defaulted portions of Claim Four.

The only properly exhausted portion of Claim Four is the claim that trial counsel was ineffective for failing to raise the denial of the motion to suppress Petitioner's statements to law enforcement in the motion for a new trial. *See Petty II*, 2017 WL 3078312, at *4. With regard to this portion of Claim Four, the court finds that Petitioner has not shown that he is entitled to relief on this claim because the determination of the TCCA was not contrary to *Strickland*. Nor was the TCCA's conclusion based on an unreasonable determination of the facts or an unreasonable application of *Strickland* to those facts.

Once again, the Court must presume the correctness of the state court factual determinations because Petitioner has made no attempt to challenge them with clear and convincing evidence. Here, the TCCA relied upon Petitioner's testimony at the suppression hearing that contradicted the theory of the suppression motion. *Petty II*, 2017 WL 3078312, at *4. The record supports that factual determination. At the suppression hearing, Petitioner testified that police only offered, "if I was completely honest with them[,] that if I told them what happened[,] that they would help me out." (Doc. No. 12-4 at 38-39). Later, on cross-examination, Petitioner testified that, when the detectives were "hammering" him, he was "relieved" to make his statement, and that he "wanted to cooperate with them." (*Id.* at 44.) When asked if he gave his statement voluntarily, Petitioner replied, "I guess." (*Id.*)

Based upon this evidence, the question for this Court in evaluating the TCCA's analysis is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105. The Court concludes that there is. "The choice of counsel to pursue

37

only his client's better arguments and not include every possible contention does not fall below objective standards of professional reasonableness. Far from it – such strategic decisions are generally applauded by the courts." *Davidson v. Lindamood*, No. 1:14-CV-00161, 2018 WL 1566823, at *16 (M.D. Tenn. Mar. 30, 2018), *report and recommendation adopted*, No. 1:14-CV-00161, 2018 WL 2192110 (M.D. Tenn. May 14, 2018), *certificate of appealability denied*, No. 18-5593, 2018 WL 6431035 (6th Cir. Dec. 3, 2018) (citing *Strickland*, 466 U.S. at 688; *Jones v. Barnes*, 463 U.S. 745, 753 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments – those that, in the words of the great advocate John W. Davis, 'go for the jugular' – in a verbal mound made up of small and weak contentions.") (internal citations omitted)); *see also, e.g., United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990) (strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel"). Trial counsel's decision not to pursue this argument in the motion for a new trial is justified by the TCCA's acknowledgment that Petitioner's testimony "left no basis for challenging his statement to officers." *Petty II*, 2017 WL 3078312, at *4. Accordingly, the TCCA did not unreasonably apply *Strickland* in concluding that trial counsel's performance fell within the wide range of reasonable professional assistance.

Furthermore, Petitioner has not demonstrated prejudice. Petitioner testified at the suppression hearing consistent with having made voluntary statements. The suppression motion was decided largely on the question of the credibility of law enforcement and Petitioner. In Tennessee, "[w]hen credibility and weight to be given testimony are involved, considerable deference is given" to trial court findings "when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." *Lewis v. State*, Nos. M2016-00738-SC-R3-WC, 2017 WL 3396558, at *3 (Tenn. Aug. 8, 2017) (citing *Madden v. Holland Group of Tenn.*,

277 S.W.3d 896, 900 (Tenn. 2009)). Petitioner has not demonstrated that a motion for new trial based on the motion to suppress would have been granted or that there was a reasonable probability that the result of the trial would have been different had trial counsel filed the motion. *Bigelow*, 367 F.3d at 570 (quoting *Strickland*, 466 U.S. at 694).

Petitioner is therefore not entitled to habeas relief on this claim.

## V. CONCLUSION

For the reasons set forth herein, Jeffrey S. Petty's claims either fail on the merits or are procedurally defaulted. Accordingly, the Petition under § 2254 will be denied, and this action will be dismissed with prejudice. Because jurists of reason could not disagree with the Court's resolution of Petty's claims, the court will deny a certificate of appealability.

An appropriate order will enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE